## UNITED STATES DISTRICT COURT
for the
District of New Hampshire

FELICIA M. DESIMINI     *In pro se*

_____
*Plaintiff(s)*
v.
JOHN F. DURKIN Jr.
An Individual

WILSON BUSH DURKIN & KEEFE PC
a Professional Corporation

_____
*Defendant(s)*

Civil Action No._____

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

### PARTIES

1. Plaintiff, Felicia M. Desimini, is an individual residing in the State of Alaska.

2. Defendants, WILSON, BUSH, DURKIN AND KEEFE PC is a professional association doing business in the State of New Hampshire and having offices at 184 Main St. Suite 222, Nashua, NH, at all relevant times.

3. Defendant John F. Durkin, Jr. (Durkin) has continuously been an attorney, doing business in the State of New Hampshire, and a partner of the above named professional association with an office at 184 Main St. Suite 222, Nashua, NH, at all relevant times.

### COMPLAINT

3. This action is a personal action by a client against her former lawyer, a partner of the defendant Professional Corporation( PC), and against the PC, for legal malpractice, for negligence and other causes of action arising out of Defendant's deficient representation of Plaintiff in a divorce proceeding under the laws of the State of New Hampshire brought by Durkin on the Plaintiff's behalf in New Hampshire against Plaintiff's ex-husband in January of 2009 and settled via a mediated settlement in Hillsborough County Family Court in October of 2010. During the course of Durkin's representation of Desimini in her divorce action against her ex-spouse, Durkin did not exercise care, skill, and knowledge. Desimini's ex-spouse (Menard) was engaged in wasting the marital estate, and Durkin was apparently, at that time, unable to discover and stop any of those activities to Desimini's detriment. Subsequent to Durkin representing Desimini at Mediation,  WILSON BUSH DURKIN & KEEFE PC purged, unknown to Desimini, Desimini's file, " per our file closing procedure,"  within months of Mediation and while in the midst of Durkin representing her in a post-divorce action causing additional her harms.

## JURISDICTION AND VENUE

4. This Court has jurisdiction as a result of diversity of citizenship pursuant to 28 U.S.C. §§ 1331, 1332, et seq., since the parties are citizens of separate states (Desimini of Alaska, WILSON, BUSH, DURKIN AND KEEFE PC a Corporation of New Hampshire and Durkin of New Hampshire) and the amount in controversy is in excess of 1.6 million dollars ($1,600,000.00), well over the jurisdictional threshold.

This Court also has jurisdiction over the Plaintiff's Common Law claims which arise out of the same nucleus of operative facts as do Plaintiff's federal claims according to the principles of pendent and/or supplemental jurisdiction. The actions and omissions complained of occurred in the State of New Hampshire and, more specifically, in Hillsborough County New Hampshire , thus venue is properly placed with this Court.

## STATEMENT OF CLAIMS

5. On or about 11/15/2008, Durkin met with Desimini at the offices of WILSON BUSH DURKIN & KEEFE PC, undertook and agreed to represent Desimini in prosecuting her divorce from Desimini's then husband. In coming to agreement for Durkin to represent Desimini's case, Durkin made certain representations to Desimini regarding his training, ability and competence in the areas of business and divorce: possession of an MBA, a Juris Doctorate, and training in New Hampshire Marital Mediation, all of which caused Desimini to enter into an attorney/client relationship with Durkin. Durkin knew that Desimini was working toward her doctoral studies and was a part-time adjunct instructor making a minimal salary and relied upon Menard for support as he controlled all of the parties' finances.

6. Desimini had only one credit card in her own name and feared Menard would discover her hire of a private detective and filing for divorce. She utilized this credit card when she met with Durkin the first time and provided him with a retainer and a brief history.

7. At a subsequent meeting at the offices of WILSON BUSH DURKIN & KEEFE PC, Durkin was provided with a video, photographs and a report produced by the private detective hired by Desimini after she heard rumors of Menard's alleged affair with a woman who was being showered with gifts and paraded around freely: Guarini.   Durkin asked Desimini for and was provided, at a later date, a narrative of the parties' 29-year relationship that she had with Menard. Durkin was advised of the parties' holdings as best as Desimini knew at the time, as she was not named on any of the marital holdings, which consisted of a home in Nashua, NH, a Co-Operative 99- year Leasehold in Brewster, MA, an IRA in Menard's name only, A Massachusetts Corporation, and an investment in a riverside Mill Condominium Real Estate Development Project in Woonsocket, Rhode Island formed as an LLC (Bernon Mills Redevelopment, LLC.), Menard Acquisitions, and R.N. Menard, Counselor. The latter two, as far as Desimini knew were inactive entities.   From the incorporated facts and materials Durkin drafted a pleading of Desimini's claims, which appeared to Desimini to state sufficient facts to accomplish Desimini's ultimate goal of a divorce based on the grounds of extreme cruelty causing Desimini substantial pain and suffering, injuring her health and reason within the meaning of New Hampshire RSA 458:7,(V) and based on the grounds of adultery RSA458:7(II) with Co-Respondent Guarini.

8. Desimini explained to Durkin that Guarini worked at BASF in Burlington, Mass. with Menard and became a family friend, frequenting events together when the families had young children. The family relationship grew. Later, in 1996, when Menard formed his own corporation, a spin-off of a BASF division, Guarini was among those who were included in the spin off Corporation, Outsource Management Solutions, Inc. (OMS, Inc.) Menard went on to sell the company while acting as the CEO. In 2003 Menard invested in the Woonsocket (R.I.) Baking Company, which became Bernon Mills Development Corporation, LLC. and Menard reformulated Outsource Management Solutions into Outsource Multiple Solutions in 2003. At some point in time OMS ceased its manufacturing operations and Desimini was unsure what Menard was doing at the office every day until she hired the private detective and learned that most of his day was spent away from the office at home until noon and by 4:30 pm he was on his way to Guarani's home.

9. On 1/8/2009, two months after agreeing, contracting and undertaking to represent Desimini, Durkin finally filed the Petition for Divorce in the Hillsborough County New Hampshire Family Court (Hillsborough County Family Court Docket No.226-2009-DM-0024) allowing Desimini the opportunity to gain a fault-based divorce with an "equitable division" of the marital assets, as they stood at the time she met with Durkin, see RSA 458:16-a, (II)(l) (1992.)

10. On 2/12/2009 the parties received an ORDER OF NOTICE issued, which included a TEMPORARY RESTRAINING ORDER which read in part:

> "The Parties are hereby restrained from selling, transferring, encumbering, hypothecating, concealing or in any other manner whatsoever disposing of any property, real or personal, belongings to either or both of them except by written agreement of both parties; for reasonable and necessary expenses of living; in the ordinary and usual course of business or investing; or by order of the Court."

11. Durkin did not effectuate service on Menard until 3/4/2009. On 3/8/2009 Menard moved out of the marital home and never returned; his mail was forwarded from this time onward.

**COUNT I LEGAL MALPRACTICE**

12. Plaintiff incorporates by reference paragraphs 1 through 11.

13. Menard hired an attorney who filed an appearance on 4/1/2009. A Structuring Conference was to be held on 4/24/2009. Durkin crafted an ASSENTED to MOTION to CANCEL TEMPORARY HEARING STRUCTURING CONFERENCE AND SCHEDULE PRETRIAL CONFERENCE, at a cost to Desimini wherein additional Court ORDERS could have been garnered, all without consultation with Desimini. Within the prior MOTION Durkin agreed to a "Pretrial Conference in 90 days, as the court's docket permits" and entered a STIPULATED STRUCTURING CONFERENCE ORDER without consultation with Desimini, which barely addressed Desimini's concerns, which were: temporary support, the temporary restraining order entered on 2/12/09, and obligations of the parties.

14. On or about April 2009 Durkin received minimal discovery from opposing counsel which included 1040 tax filings from Menard; tax filings prepared by Menard's business tax attorney. On 5/9/2009 Desimini repeatedly voiced her concerns in emails and letters to Durkin about the most recent tax return, which she had not seen until then. The return indicated that extravagant monies were being withdrawn from a retirement account (a 401k retirement account which had been converted to a roll-over IRA in Menard's name only.) Desimini stated that the monies were spent at an alarming rate and she had no idea how they, as a couple, could ever had spent the kind of money reported on the tax returns since the business was not manufacturing anything; money to which Desimini had no access, and was being deprived of, which left her at an unfair advantage when compared to Desimini's meager part-time adjunct salary. After superficial inquiry to opposing counsel only, Durkin allowed Menard to withdraw monies from said IRA and spend monies freely without thoroughly investigating his claims of "normal course" for business and personal expenditures. Desimini was concerned and asked for a forensic accountant and Durkin's response to Desimini was that there was nothing that could be done. Desimini pleaded with Durkin to stop Menard, and again Durkin stated that there was nothing he could do.

15. The first set of Menard's Interrogatories were signed on 6/29/2009 and were returned along with some Production of Documents (PODs) sometime in August. Menard admits to a sexual relationship with Guarini within these Interrogatories.

16. Durkin suggested and allowed Desimini to gather financial information from Menard's tax attorney during this time without concern about a possible conflict of interest. Discovery production from Menard was minimal and obfuscatory at best up to this point, as is noted in a MOTION TO COMPEL filed by Durkin on 10/23/2009. A PRETRIAL CONFERENCE was scheduled on August 28 2009. Durkin submitted a MOTION TO CONTINUE the Conference for 90 days at a cost to Desimini. This continuance was done without consultation with Desimini.

17. Pleadings from Durkin's Motion to Compel indicate Durkin did not have a grasp on the gravity of the financial situation, yet Durkin knew that Desimini was at his and Menard's financial mercy;

> *"5.The parties own significant assets secured through dealings of Menard. Throughout the marriage, Menard was responsible for maintaining all marital assets.*
>
> *6. The Petitioner depended on Menard to invest and enter into business deals or the gain and benefit of the parties.*
>
> *8. The records and financial information of the parties and Menard's business interests are vast however, they are necessary for the Petition to determine the full scope of the assets and liabilities of the parties.*
>
> *9. Menard has always paid for the parties' expenses through withdrawals from the parties' retirement accounts which have significant amounts of funds.*

> [Number 9 as stated is not true as the Petitioner is working and Menard had always worked, as far as the Petitioner knew. The extent of withdrawals were not known to the Petitioner, as they were not in Petitioner's name. The withdrawals and what was going on with them escaped Durkin. Durkin often plead his filings without sharing them with Desimini]
>
> *10. Menard operates a business, Outsource Multiple Solutions (OMS) out of Burlington, Massachusetts, which runs on negative income. It is unclear from the information and documentation that Menard has provided how or why the business operates on negative income. The petitioner is concerned that Menard is utilizing joint marital assets to run his business.*
>
> *11. Menard's girlfriend, Guarini, is employed by the Respondent at OMS and benefits from income from her employment, as well as "business dinner" and "business trips" for which it is unclear how these expenses are paid for by a business that has negative income."*

18. The Hearing on Durkin's MOTION TO COMPEL, filed on 10/23/2009, was scheduled on 12/3/2009. A Motion to Continue was filed by Counsel for Menard and the continuance was assented to by Durkin. Desimini replied to Durkin's e-mail and asked that there be no continuance and was told in a reply email that opposing counsel had to be in Court that day. There are no other e-mail communications from Durkin asking for Desimini's consent to a continuance, as so provided by the NH Family Court Rule 1.27 Continuances:

> C. *Any motion to continue filed by counsel shall contain a certification that the client has been notified of the reasons for the continuance, has assented to the motion, and has been forwarded a copy of the motion.*

19. Prior to the 2/3/2010 Hearing on Durkin's MOTION TO COMPEL some discovery was forthcoming, but it mostly involved Menard's 2008 tax year supporting documents. In January of 2010 Desimini was concerned about the upcoming hearing and called Durkin to discuss how to handle the Discovery that they had. Durkin did not offer any solutions to Desimini; Desimini offered that she had an acquaintance who had some accounting experience who might be willing to look at the Discovery; Durkin said okay. Durkin did not once suggest to Desimini that an accountant, forensic accountant or some type of expert witness would be needed to go forward at trial if any irregularities were found.

20. Prior to the 2/3/2010 Hearing, Desimini was able to get her "accountant friend," who was not of expert witness caliber, to aide her to try and make sense of the piecemeal Discovery that had been provided. On 2/01/2010 Desimini remarked to Durkin since he (Menard) is taking out $10,000 a month from the retirement account on a regular basis, can she have alimony of $5,000 a month? Then after further investigation into the minimal discovery on 2/02/2010, Desimini remarked to Durkin in emails and documentation that the company appeared to be a sham, that the medical insurance expenditures were out of the ordinary, that $14,000 in expenses for a boat that was docked seemed unusual. Durkin's office replied that they would address the alimony and documents she provided at the upcoming hearing.

21. At the 2/3/2010 Hearing on Durkin's MOTION TO COMPEL Durkin submitted PETITIONER'S PROPOSED ORDER ON MOTION TO COMPEL at a cost to Desimini. Durkin SETTLED the MOTION TO COMPEL issue, as noted in the Family Court's 2/3/2010 "Recommendation By Agreement" ORDERS. Wherein Durkin requested and agreed that certain conditions be met within 30 days from the date of that hearing. Desimini knows now that Durkin failed to enforce the Court's ORDERS. Specifically Durkin failed to gather the discovery as "Recommended By Agreement" after this Hearing or any time thereafter prejudicing Desimini's knowledge. The following items, at minimum, were never gathered by Durkin subsequent to the Hearing on 2/3/2010 or as "Recommended By Agreement:

> *#3 Information on income from interest, dividends, loans and cash advances from January 1, 2006 through the present;*
>
> *#7 Bank account:*
>
> *Citizen's 6359: All canceled checks from January 1, 2006 through present (requested POD A); August, September and October, 2009 statements and registers;*
>
> [As a matter of fact, no canceled checks from any accounts were ever produced though they were available on all statements sent in the mail, and available online for a certain period of time thereafter.]
>
> *#10 Retirement Accounts:*
>
> *Complete Statements from January 1, 2006 through the present. Menard only provided 1 page out of an average 10 page statement. [Durkin was negligent and did not discover that Menard had a company retirement set up for Desimini and Guarini and neglected to learn about an IRA account set up for Guarini.]*
>
> *#18 Business Interests:*
>
> *Menard indicated that he would obtain the current expected profit and loss for the Bernon Mills REAL ESTATE project and would send separately. Menard has not provided the documentation.*
>
> *Further documentation concerning his interest in, financial investment in, and any potential profit from the Bernon Mills Redevelopment project (which has been active since 2003), as well as the anticipated completion date of the project.*
>
> *#23 Gifts given to Rosalyn Guarini*
>
>> *A description of each gift given to Rosalyn Guarini.*
>>
>> *(Durkin failed to discover a vast array of gifts, monies, loans, retirement accounts, and mortgages arranged by Menard on behalf of Guarini and for Guarini.*
>
>> **Production of Documents:**
>
> *B.       Documentation concerning the $18,000 loan to Rosalyn Guarini;*

    [Though documentation was provided, there were conspicuous entrees in the registers (see below) that may indicate that the money was actually given back and the registers were missing months and obviously altered as there are reconciliations errors.]

    D.    Documentation on "loans" listed in check registers Documentation on all loans made by Menard to himself or to any of his business and investment interests.

    [See response to B.]

22. On 3/31/2010 Durkin filed a Motion for Conditional Default due to the fact that Menard was not producing Discovery in an expeditious or congruous manner. Documents were missing from months and some months were missing altogether. This discovery was ORDERED on 2/3/2010 in a "Recommendation By Agreement," in which the parties had agreed to and was requested over 6 months earlier.

23. A DEFAULT HEARING was scheduled for 5/24/2010, and in the meantime two more Motions concerning Discovery were filed between Durkin and opposing counsel. On 5/21/2010, Durkin filed an Assented Motion to Continue the DEFAULT HEARING at a cost to Desimini, stating that "the parties have agreed to give the Respondent until June 28th to provide all of the discovery materials which are regarding the Petitioner's request for Final Default against the respondent. This continuance was done without consultation with Desimini, as in the past, and there is no record of Desimini's consent.

24. During the summer semester (6/2010-9/2010,) Desimini was making no money as the classes she was scheduled to teach at Fitchburg State University did not have the requisite number of students to support her salary and were canceled.  Durkin knew this fact, and Desimini was incurring credit card debt, and the home she was living in was falling into disrepair due to Menard's neglect. Desimini paid for Durkin's representation, maintenance, and repairs as best she could up until this point during the separation using her credit card.

25. On 6/19/2010, after 6 years of study and working "part-time" as an adjunct, Desimini defended her dissertation for her Ph.D. in Arts-Based Research and Art Criticism. Weighing the doctoral committee's questions and input, Desimini worked on her dissertation full-time for the next eight months and graduated with her doctorate on March 31, 2011.

26. On 7/15/2010, Desimini emailed Durkin asking if it was time to take off the boxing gloves and freeze the assets immediately.  Durkin did not respond.

27. Sometime during the month of July of 2010, Durkin's office agreed to and arranged to go to Mediation with Menard on 8/26/2010.  Discovery does come in but is lacking and no further requests for Discovery were made by Durkin since his agreement on 5/21/2010, or during the period leading up to Mediation. If there were any additional requests for Discovery, Desimini is not made aware of them, and there are no records to substantiate any further requests.

28. On 7/30/2010 Desimini emails Durkin about some Discovery that has been shared resultant to the 5/21/2010 agreement and some of the concerns she raises are:

*#7 They say 99% of the checks are redundant ...The man is deliberately obfuscating his responses and cannot be trusted*

*The check registers seem "doctored",*

*#18 Who are the partners? What is Guarini's stake*

Desimini also raised a number of concerns about rumored expenses that Menard had in regards to Guarini, but she was unable to prove any of it as she is an artist not a forensic accountant or an accountant.

29. On 8/4/2010, Desimini emailed and dropped of her commentary and revision's to Durkin proposed Divorce Decree that he had prepared. Desimini in her commentary asks that some of the assets be divided as so afforded a fault-based divorce. For example,

*"ii Felicia is awarded 60% of all bank accounts*

*B. Stocks and bonds: Felicia    is awarded 60%*

*#12 Business Interests of the Parties.*

*We have to make sure this is loop-hole-free*

*I also want 60% of his share of the Bernon Mills Project, and any and all of his future earnings of the project.*

*#14 Marital Homestead:*

*The home in Nashua requires approximately $60,000 worth of repairs….*

*#15 Other Real Property*

*The beach house is sold with a division of 60% for me*

*OR_*

*The shares are transferred to Felicia (Desimini), with all rights of the coop membership transferred, as well as ownership of the beach house transferred to Felicia.*

*#20 TAX REFUNDS*

*(How will I know how much he is making /hiding on the Bernon Mills project? We should probably talk about this, John.)*

*D. I don't trust this section and perhaps you and I can discuss it.*

30. On 8/13/2010 Durkin had to cancel Mediation because he had an issue with another client. The next agreeable date for all parties was 9/16/2010. Durkin informs Desimini via e-mail about the postponement and her approval is not sought.

31. On 8/18/2010 Durkin's office sent an email to the mediator concerning payment for Mediation indicating that Menard would need to pay for 100% of the mediator's fees as Desimini had no money.

32. On 9/07/2010, due to her doctoral studies, Desimini was asked and allowed to teach three classes, which is considered a full teaching load for an instructor. She prepared for classes each day as well as focused on her dissertation/graduation requirements.

33. On 9/08/2010, eight days prior to Mediation, Durkin sent an email stating he had other client issues that required his attention and wanted a further continuance of the 9/16 Mediation until mid-October. It was finally agreed on 9/20/2010 that Mediation would occur on 10/20/2010. Again, Durkin office copies Desimini via e-mail about the postponement and her approval is not sought.

34. Durkin and Desimini did not communicate during the period from mid- August until just before Mediation. Desimini was extremely busy trying to earn money, her doctorate, and stay focused on her career.

## COUNT II NEGLIGENT MISREPRESENTATION

35. Plaintiff incorporates by reference paragraphs 1 through 34.

36. On 10/14/2010 (Wednesday) Durkin prepared a package of documents to Desimini which included a cover letter, a proposed Asset Distribution Sheet, a proposed Divorce Decree, and Menard's financial affidavit from the 2/3/2010 Hearing. This information was faxed to the mediator and opposing counsel on 10/19/2010 as well. The Asset Distribution Sheet Durkin has the Fair Market Value of Menard's 15% (sic) interest in the Bernon Mills Redevelopment listed as $1,000,000.00. In the cover letter Durkin explains:

> "his income is minimal and his activities appear to be largely related to spending money to carry assets, such as the Bernon Mills project. My (draft) proposal seeks to disconnect you and Ron and leave you with no debt. Please review and meet with me on Monday, October 18, 2010. Please contact my office to arrange an appointment."

37. Desimini received and reviewed the package of materials, made her edits and notes on the weekend of 10/16/2010-10/17/2010.

38. On 10/20/2010 all the parties met at 9:30 am until approximately 4 pm for a full day of strenuous Mediation.

39. Desimini was unsure of the deal that was being presented to her throughout the Meditation and was told that it was a "good deal" and "you won't get a better deal than this" by Durkin on several occasions. The parties ended Mediation and Menard submitted his "financial affidavit as a formality" for the court.

Durkin stipulated and agreed to waive fault grounds and allowed Menard to submit the same financial affidavit as submitted on 2/3/2010, by re-dating the previous affidavit to 10-20-2010 and changing a few numbers as opposed to insisting on having a new, carefully crafted financial affidavit drawn up and investigating the authenticity of the figures alleged by Menard.

40. On 10/20/2010 Durkin encouraged Desimini to sign the Permanent Stipulation without seeing the 2009 tax returns, which were filed by Menard and his tax attorney on 10-18-2010, without Desimini's or Durkin's knowledge or consent. Additionally Durkin settled the Divorce without knowing the tax consequences that would be incurred for the 2010 tax year and stipulated that his client join Menard to sign onto the 2010 tax year without having a full accounting or complete discovery of all assets that were known by Durkin at the time of the mediated settlement. Menard did not account for the withdrawals from his IRA as income on his financial affidavit, but reported extremely large tax debts as a monthly expense, and also reported that he was paying a $1750 Mortgage payment. In summary the Permanent Stipulations incorporated into the Decree of Divorce which Durkin encourage Desimini to sign were as follows:

    a) Durkin stipulated and agreed Desimini would receive the marital home had a $249,000 Home Equity Line of Cred it in Menard's name only to be paid off within six months from the date "herein ." There were no valuations or appraisals performed.

    b) Durkin stipulated and agreed that Menard would receive the shares entitling him to the Brewster MA Co-op Leasehold, which had no liens or encumbrances valued at approximately $900,000. There were no valuations or appraisals performed.

- a) Durkin stipulated and agreed that Felicia would receive $270,000 within six months of which $21,000 was due and owing before the agreement would come into full force and effect. (Desimini's credit limits were being approached and she needed to pay off debt that she incurred paying Durkin through the proceedings.)
- b) Durkin stipulated and agreed that Menard would retain his Businesses, all assets and liabilities. There were no valuations or appraisals performed.
- c) Durkin stipulated and agreed that Menard would retain the funds in "his" retirement accounts, $266,000.
- d) Durkin stipulated and agreed that Menard would retain Desimini's profit sharing account that was held within the OMS, Inc. Corporate profit-sharing plan.
- e) Durkin stipulated and agreed that Menard would retain $15,000 of Desimini's Emgg retirement account and split equally any amount above $15,000 with Desimini.
- f) Durkin stipulated and agreed that Desimini would share in net proceeds of Bernon Mills Redevelopment, LLC. *"should Ronald (Menard) sell or liquidate his interest in the Bernon Mills project, any net proceeds received (after taxes) shall be divided equally between the parties."* There were no valuations or appraisals performed.
- g) Durkin stipulated and agreed that Desimini would retain her $150,000 student loan debt that she had incurred since 2002.

41.  Within short months of Mediation, Desimini sought Durkin for assistance. The IRS sent a Notice of Intent to Levy to Desimini for the 2009 tax year; $84,000 was due and owing for unpaid income taxes, which became due at the time they were filed: two days before Mediation unknown to Desimini. Desimini contacted Durkin on multiple occasions. On 5/31/11, Durkin responds that he will seek out "an accountant who is good in this area." Desimini pleaded with Durkin to assist her with the situation and to help her collect the mediated settlement he negotiated. Menard was to pay Desimini her monies on 4/20/2010 and the situation was looking bleak. Desimini took a second job at Southern New Hampshire University to make ends meet as she feared the worst.

42. On 6-2-2011 Desimini was contacted by Durkin's assistant, working for the firm of WILSON BUSH DURKIN & KEEFE PC who had just been handed her file and asked to inform Desimini, that she should contact a CPA in Manchester "He is great with IRS issues."   Desimini sent the CPA the tax filings requested and Desimini, at the urging of friends, contacted the Innocent Spouse Department of the IRS.

43. On 6-27-2011 Desimini's checking account was levied, and wages were garnished. Desimini was able to recover the amounts levied from the checking account almost immediately, due to Desimini's efforts to assert Innocent Spouse; her wages would take two more months to recoup. Durkin, at this time was representing that he was Desimini's attorney to Desimini and other attorneys and claimed to be assisting Desimini in letters he had written on her behalf and during phone calls.

44. Desimini informed Durkin on 7-9-11 in an email that fraud may have been committed, and Durkin asked Desimini to supply documentation.

## COUNT III SUPERIOR RESPONDEAT BREACH OF FIDUCIARY DUTIES LEGAL MALPRACTICE

45. Plaintiff incorporates by reference paragraphs 1 through 44

46. On 7-25-2011 in response to Desimini's request for documents in her file, Durkin informed Desimini that

> "We have purged the purged the majority of your file per our file closing procedure. You should have most of it if not all docs from the case. I can ask Coughlin for the June 2009 letter on the beach house.
> Obviously he wouldn't have the letter you sent to me regarding the pre trial statement. (Jan 2010)
> John"

47. At no time did Desimini terminate her attorney client relationship with Attorney Durkin nor did she inform any staff member of WILSON BUSH DURKIN & KEEFE PC that she was terminating her attorney client relationship, on or before 7-27-2011. Desimini trusted Attorney Durkin to perform as her attorney: that he and the firm would retain her file for future use if needed; and represent her in the issue as he was writing letters, a motion and making calls on her behalf;. Durkin was Desimini's attorney according to the rules of the NHBA and the Professional Conduct Committee, as written.

48. At no time did Desimini pick up her file from the offices of WILSON BUSH DURKIN & KEEFE PC prior to 8-5-2011.

48. At no time did Desimini give WILSON BUSH DURKIN & KEEFE PC or any employee or member of the firm permission to purge her file.

49. There are no signs conspicuously posted which state that your file will be purged once settled anywhere in WILSON BUSH DURKIN & KEEFE PC offices or common areas.

50. WILSON BUSH DURKIN & KEEFE PC presents to belong to the New Hampshire Bar Association (NHBA) and attorney Durkin presents to belong to NHBA as well as the American Bar Association (ABA,) but purging Desimini's file is contrary to the rules of both organizations. WILSON BUSH DURKIN & KEEFE PC compromised Desimini's discovery and Desimini's rights in the instant case and in the divorce as well, due to careless disregard of Durkin and WILSON BUSH DURKIN & KEEFE PC as fiduciaries to preserve and protect Desimini's interests, rights, opportunities and concerns.

51. Defendants, by virtue of the actions and failures described herein above, breached said fiduciary duties as attorneys practicing under the rules of the NHBA and the ABA.

52. Desimini was distraught and unable to go forward with Durkin as her attorney and to seek and hire new counsel at a significant cost to herself.

53. On 8/2/2011 Desimini emails Durkin for her file and tells him that she will be in on Friday 8/5/2011 before 4:30pm to retrieve what is left of her file, Desimini receives no response to the email. On 8/5/2011 Desimini goes to the offices of WILSON BUSH DURKIN & KEEFE PC and is handed approximately 56 pages of mostly post-Mediation communication and is asked "where are we supposed to keep the files?" by a receptionist named Kathy.

54. In the interim, while seeking new counsel, Desimini filed a few, albeit futile, Motions in New Hampshire Family Court in pro se to ameliorate the situation at hand, one of those was an Ex-Parte Motion to Attach. Desimini sought to attach the Massachusetts leasehold in New Hampshire Family Court and was informed by the Court that the Court did not have jurisdiction. Then she filed Ex-Parte Contempt Motion for Menard's failing to abide by the Stipulated Agreement. Desimini engaged in therapeutic sessions in an attempt to regain her peace of mind.

55. Desimini sought Massachusetts counsel to place a lien on the Massachusetts leasehold. The out-of-state lien cost Desimini $5,000 plus credit card interest. A right to enforce a security interest was not provided for in the stipulated agreement on the Massachusetts leasehold, an exercise of skill care and knowledge would have provided for such a cost free lien.

56. After searching and interviewing Attorneys for weeks, Desimini secured counsel in New Hampshire who was not familiar with Durkin, as those attorneys she approached all cautioned they might have a conflict of interest.  Desimini's new counsel successfully filed a Petition in the Hillsborough Family Court to Modify Decree of Divorce. <u>PETITIONER'S PETITION TO BRING FORWARD AND MODIFY DECREE OF DIVORCE</u> was filed on 9/28/2011.

57. In preparation for the upcoming hearing Menard was deposed on 4/4/2012 wherein he testified that there were no books or records produced for OMS, Inc. or Bernon Mills, LLC.

58. On 4/19/2012 the Family Court ruled favorably in the Desimini's favor on both Motions before it as follows:

> In Regards to the EX-PARTE MOTION FOR CONTEMPT the Family Court found:
>
> *"Menard (Menard) is in contempt for having failed to pay the 2009 federal income tax obligation. He was not paying taxes on withdrawals from funds that he was using to pay expenses despite including those taxes as an expense on his financial affidavit. Consequently, in June 2011, the IRS levied the petitioner's bank account garnished her wages and placed a tax lien on her home."*

(The tax liens are on the home to this day and there are additional liens for the 2010 federal tax year as well as property taxes due for 2012 and 2013.)

In regards to the <u>PETITIONER'S PROPOSED ORDER ON PETITION TO BRING FORWARD AND MODIFY DECREE OF</u> DIVORCE the Family Court found:

> 1) *Petitioner's Petition to Bring Forward and Modify Decree of Divorce is hereby GRANTED.*
>
> 2) *On his October 20, 2010 Financial Affidavit filed with the Court in conjunction with the parties' Permanent Stipulation, Menard failed to reference all of his assets or alternatively, grossly underestimated the fair market of his assets.*
>
> 3) *Specifically, Menard failed to list his fourteen (14%) interest in Bernon Mills Redevelopment LLC, a real estate Redevelopment project located in Rhode Island which is indebted to Menard in the approximate amount of $300,000.*
>
> 4) *In Addition, Menard failed to reference the full extent of his interest in Outsource Multiple Solutions Inc. which is indebted to Menard in the approximate amount of $650,000.*
>
> 5) *On his October 20, 2010 Financial Affidavit filed with the Court in conjunction with the parties Permanent Stipulation, Menard failed to disclose his income which amounted to approximately $20,000 per month in the form of withdrawals from Menard's Charles Schwab individual retirement account.[ However, petitioner had knowledge of the withdrawals (this was handwritten without clarification).....*

59.  <u>The PETITIONER'S PETITION TO BRING FORWARD AND MODIFY DECREE OF DIVORCE</u> was ruled and a new trial was granted to Desimini. Thus the case was resolved in Desimini's favor and at that point Desimini was legally entitled to file this action against Durkin. As a consequence of the foregoing, the issue of liability for professional malpractice is *res judicata*, and the only remaining issue at trial of this matter will be the amount of damages.

60. Due to the lack of a file containing discovery, communications, work product, notes and other documents which had been purged by Durkin, Desimini was extremely prejudiced going forward to prosecute her matter in Family Court.  Recreating prior discovery was tedious, costing Desimini a good deal of her own time, was exorbitant and incomplete. From Discovery during the Modification phase it was determined and found that Menard had "spent" most of the rest of the monies and had little of the IRA left; that the payments to the Credit Union holding the Construction Loan on Bernon Mills had not been paid since 2008. Discovery also produced that OMS, Inc. had sold all of its manufacturing assets in 2005 to a competitor and was not making any monies at all since that point in time. Durkin did not discover this. In essence, the situation with the company is convoluted at best, one which Durkin did not take the time to investigate or to enforce the 2/12/2009 restraining order during the pendency of the divorce.

61. Leading up to trial Menard was ordered to pay nominal attorney's fees, $17,201, which are still uncollected; but because Menard claimed poverty, a defense to contempt in New Hampshire, he was not ordered to pay for his continual contempt issues. Desimini has borne the cost of Petitioner's <u>PETITION to MODIFY DECREE of DIVORCE</u> up through trial and beyond, in excess of $43,000 due to a zealous discovery process.

62.  Durkin's many breaches have impacted Desimini greatly in that: Desimini became aware in the modification process that Desimini may never see settlement and Desimini's family relationship with her daughter, son and grandchildren are almost nonexistent due to "re-opening" of the divorce and its aftermath.

63. On 8/7/2012 Desimini (at 59 years of age) moved away from family and friends to take on a full-time position with benefits in Alaska due to the fact that Menard could no longer afford to pay for Desimini's medical insurance as so mediated by Durkin. Life as Desimini had once known was greatly impacted as she had to leave the home she lived in for 26 years.

64. In January of 2013, as part of Discovery, Desimini was granted an inspection of Menard's attorney's records, and it was within these records that she gleaned a lot of the discovery that she was missing: the Asset Distribution Sheet, the proposed Decree as they were faxed to the Mediator, checking account "registers," some attorney- to- attorney communications. There were no real business records for OMS or Bernon Mills.  There were two banker's boxes of discovery and Desimini spent 4 hours poring over the information as best she could, but had to leave on a plane soon thereafter.  There is no cognizable reason for Durkin to have purged Desimini's voluminous file when she asked Durkin for help within months of mediating and stipulating to an agreement for Desimini's divorce.

65.  Through court orders Desimini learned that Menard was not making the mortgage payments that he claimed he was making on his 2/3/2010 nor his 10/20/2010 financial affidavits as so provided to Durkin. RBS Citizens Bank has offices throughout New Hampshire.

66. Through Discovery and depositions, Desimini learned that the Bernon Mills Real Estate Redevelopment was Bankrupt and the loan had not been paid on since 2008, which is contrary to the FAIR MARKET VALUE of $1,000,000 that Durkin represented to Desimini before and at Mediation which

induced her to sign the Permanent Stipulation signed on 10/20/2010 as incorporated into the Decree of Divorce.

67. Durkin failed to realize that the amount claimed by Menard to have been in the IRA at time of filing was actually $636,000, not the $500,000 reported on the 2/3/2010 and 10/20/2010 financial affidavits. Had Durkin hired or suggested Desimini hire a forensic accountant as Desimini asked to do on many occasions, Durkin would have seen that the assets within the IRA were increasing in value almost as quickly as Menard was taking them out. Due to the slow and labored discovery process that Durkin allowed to occur, instead of timely Court intervention, the involvement of a Commissioner or Receiver which should have occurred, Menard was able to dissipate and diminish the marital estate. From Tax Returns gleaned from the Modification phase discovery, Menard was able to withdraw $682,600 (2009 through 2010) and another $225,270 (2011-2012) yielding a total of $907,870 from an IRA that allegedly only had $500,000 at filing and only $260,000 at Mediation, when the marriage came to an end. This $407,870 difference alone that Menard gained without an equitable division is a major concern for Desimini. Durkin's lack of due diligence and negligence has cost Desimini time, money, aggravation, time with family and friends, peace of mind, a long-time family home in New Hampshire, and retirement funds, as well as possibly the family vacation home.

68. The home that was mediated by Durkin to be awarded to Desimini and to be paid off in six months is about to be lost in foreclosure at a loss of $338,000 to Desimini. Durkin's lack of due diligence and zealous discovery did not discover that the mortgage payments of $1750 as represented on the two 2010 financial affidavits, were actually not being paid. Additionally, this home is encumbered by approximately $150,000 in Menard's income tax liens and debts. Meeting in court at an earlier date, Durkin may have discovered that Menard was actually taking money out of the equity line of credit and not reporting it as income, thus incrementally adding to the diminution and dissipation of the marital estate. Simple subpoenas to RBS Citizens Bank would have discovered this fact and earlier financial affidavits would have provided Durkin a more accurate picture of Menard's activities insomuch that a prudent attorney would have and could have acted quickly.

69. Menard admitted at trial that he had dissipated 1.8 million dollars from the IRA since 2008, an IRA that was held in his name only. Desimini had contacted Durkin in 2008. Menard could not account for any of the monies that he had spent during the divorce, and it was further found by the court in response to Desimini's pleadings at TRIAL ON THE PETITION TO MODIFY THE DECREE OF DIVORCE that Desimini was awarded an additional award of 50% of the $350,000 Net Operating Loss (NOL) tax carrybacks associated with the BERNON MILLS REDEVELOPMENT (#3 as referenced in Paragraph 18) and 50% of tax losses associated with OMS, INC. that may be claimed in the future (#4 as referenced in Paragraph 18). These awards were in addition to what Desimini had stipulated to. Desimini would prefer to have the monies associated with the losses to the marital estate rather than a NOL. Additionally in Findings of Fact and Rulings of Law submitted by Menard's attorney at the TRIAL on 6/12/13, the following were found UNSUBSTANTIATED by the Family Court:

UNSUBSTANTIATED 6. The settlement reached at Mediation was the result of an arms-length negotiation over several hours based on complete discovery of the marital estate by competent counsel with the oversight and Mediation of a highly experienced (16 years) retired Marital Master.

UNSUBSTANTIATED 9. The Court's findings via its Notice of Decision dated April 19, 2012 are insufficient to establish that (Mr. Menard) failed to disclose marital assets of value or otherwise defrauded Mrs. Menard (aka Desimini.)

UNSUBSTANTIATED 11. Furthermore, discovery exchanged between the parties prior to the October 2010 Mediation advised both parties as to the viability of these propertied (sic) assets and the associated debt incurring them.

UNSUBSTANTIATED 12. Mrs. Menard (aka Desimini) seeks to re-do her property settlement because it is financially unsettling and unsatisfactory to her.

70. Durkin failed to research the validity of the businesses and their business expenditures. No discovery was forthcoming from Menard Acquisitions or R.N. Menard, Counselor.   Menard's holdings in the BERNON MILLS REDEVELOPMENT as misrepresented to Desimini by Durkin was that Menard's expenditures were in support of assets and that the Bernon Mills was worth $1,000,000 in respect to Menard's 14% (sic) interest. This misrepresentation induced Desimini to agree to the mediated settlement as Desimini believed that she would soon share in the net proceeds of the "money to carry assets, such as Bernon Mills" (See paragraph 36,) a 50% share of those proceeds. Desimini believed these proceeds would be forthcoming in the very near future. As previously stated, the Note on the Mill Project had not been paid since 2008. An exercise of care and skill by Durkin would have learned this fact.

71. Compare an identical IRA account, one set up by Menard with his tax attorney's son for Guarini, which was discovered post-Mediation and contained the same holdings as Menard's. Desimini did not have a comparable IRA. Hers was a meager $30,000, whereas Guarini's was in the hundreds of thousands of dollars. Guarini's IRA had nothing taken out of it during the period of Desimini's divorce; the comparable account increased in value by 26.81%. Had Durkin restrained Menard to withdraw only the funds from the <u>marital estate IRA</u> that were needed to pay down the parties' bills and reasonable expenses ($70,000/year not including Desimini's salary,) the IRA would have been worth approximately $678,178 at Mediation; the debt on the marital home would have been paid down by $35,000 leaving a balance owing of $203,449 on the marital home instead of $249,000 that was owed at Mediation. Thus, the Equitable Split would have been among the following assets, which does not account for furnishings, vehicles, Desimini's IRA:

| | |
|---|---|
| Approximate IRA value | $678,178 |
| Brewster Leasehold | 850,000 (appraised value 2013 at a cost to Desimini) |
| New Hampshire House | <u>338,000</u> (appraised value 2013 at a cost to Desimini) |
| Total Estate | $1,866,178 |

A divorce case prosecuted with care, skill and knowledge "causing substantial pain and suffering and injuring health and reason" within the meaning of New Hampshire RSA 458:7(V) & adultery RSA 458:7(II) as grounds typically yields a 60/40 split in New Hampshire. The net result to Desimini could have been $1,119,706 had Durkin exercised care, skill, and knowledge in providing legal services to Desimini and not repeatedly breached his duty to her.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Desimini demands trial by jury in this action of all issues so triable.

## DAMAGES AND PRAYERS FOR RELIEF

Wherefore, Desimini asks this Court to order WILSON BUSH DURKIN & KEEFE PC and John F. Durkin Jr. to:

A. Pay damages in the amount of One Million One Hundred Nineteen Thousand Seven Hundred and Six dollars ($1,119,706) along with attorney's fees, costs and other damages;

B. Award enhanced compensatory damages to Desimini as to all these claims together with pre-judgment interest against WILSON BUSH DURKIN & KEEFE PC and John F. Durkin Jr.;

C. Award exemplary damages proved by Desimini as to all these claims;

D. Award Desimini such costs other and further relief as the court may deem just and proper.

Respectfully submitted,

*Date:* __March 14, 2014_____ *Signature:*_____/s/Felicia M. Desimini_____

Name:___ FELICIA M. DESIMINI

(Typed or Printed)

Address:_____4409 E CRANE RD

WASILLA AK, 99654_

email address___feliciadesimini@gmail.com

Telephone No.____907-631-3531